IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NANCY McILWAIN                          :

                                                  :

    v.                                  : Civil Action No. DKC 2006-0586

                                                  :

KAISER FOUNDATION HEALTH PLAN
 OF THE MID-ATLANTIC STATES,   :
 INCORPORATED

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is the motion of Defendant Kaiser Foundation Health Plan for the Mid-Atlantic States, Inc. for summary judgment.[1] (Paper 16). The issues are briefed fully and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion for summary judgment will be granted.

**I.  Background**

The following facts are based on Plaintiff Nancy McIlwain's complaint and the evidence submitted by the parties with respect to Defendant's motion for summary judgment. The facts are undisputed except as noted, and where disputed are presented in the light most favorable to Plaintiff. Plaintiff, who is white, was employed on

---

[1] Defendant indicates that the caption of Plaintiff's complaint does not correctly identify Plaintiff's employer. (Paper 11, at 1 n.1; paper 16, at 1 n.1). Defendant states that Plaintiff's employer is actually Kaiser Foundation Health Plan of the Mid-Atlantic States, Incorporated, and not Kaiser Permanente. Defendant's statement will be construed as a motion to substitute the real party in interest, and this motion will be granted.

a weekend schedule as an imaging services assistant, a position also referred to as an x-ray clerk, at Defendant's Camp Springs, Maryland medical facility.   Her employment was terminated by Defendant on January 7, 2005.   Plaintiff had been employed by Defendant for over 16 years.   (Paper 16, Ex. B, Ross Dep., at 62). Sharon Boyette, an African American, was hired to the position of imaging supervisor and became Plaintiff's direct supervisor in approximately August 2004.

Prior to August 2004, Plaintiff had completed an educational program at Prince George's Community College, as required for a higher-level radiologic technologist position.   She also obtained a license from the Maryland Department of Health and Mental Hygiene as an authorized medical radiation technologist.   (Paper 19, Ex. 6, at 2).   Plaintiff approached Ms. Boyette on several occasions asking for permission to fill in as a radiologic technologist when the department was short of staff because technologists were on vacation or had called in sick.   Ms. Boyette repeatedly denied this request, according to Plaintiff, initially without giving a reason.[2]   (Paper 16, Ex. A, McIlwain Dep., at 72).   Instead, absent radiologic technologists were covered by temporary staff.

_____

[2] Defendant contends that Plaintiff was not allowed to fill-in for radiologic technologists because it would be difficult to move Plaintiff between positions in the imaging department without violating Maryland health regulations (paper 16, at 3), which, among other things, require a radiologic technologist to wear a name badge identifying her title.   Md. Code Regs. 10.32.10.07(E).

Plaintiff contends that most of these temporary staff were African American, and that one temporary radiologic technologist, Verna Curry, who is African American, was particularly favored by Ms. Boyette.

Plaintiff asserts that Ms. Boyette managed the workplace in a racially discriminatory manner:

> Sharon Boyette, has repeatedly allowed African American employees to violate policies such as leaving their post for impermissible periods of time, watching movies at the work place, arriving to work late, leaving early, going for extended lunch periods and even extended leaves all without any disciplinary action.  While other African American employees were permitted to take CPR classes, Boyette scolded me for taking CPR classes.
> I verbally informed Boyette of these violations, which exacerbated relations with her.  She consoled the offending individual after I reported the violations to Boyette.

(Paper 19, Ex. 3, McIlwain Aff., at 1-2).  Plaintiff also contends that a fellow employee, Dana Williams, watched the movie "White Chicks" on a personal DVD player while at work.  Plaintiff contends that she could clearly overhear the movie, and found its portrayal of Caucasian women offensive.  Plaintiff called Ms. Boyette's pager to notify her of this conduct, but felt that Ms. Boyette had been dismissive of Plaintiff's allegations.

Plaintiff was interested in a full-time weekday radiologic technologist position with Defendant at the Camp Springs facility, but she contends that she never saw such a position posted, and hence never applied for a position at Camp Springs.  Ms. Curry was

hired as a full-time radiologic technologist at Camp Springs during this period.  Defendant contends that this position was posted. The notification form associated with this position, produced by Defendant during discovery and submitted by Plaintiff, indicates that the position was open between August 5, 2004 and August 12, 2004.  (Paper 19, Ex. 9, at 1).  Plaintiff did see a posting for a part-time radiologic technologist position at Camp Springs, but chose not to apply for that position.  Instead, Plaintiff applied for and was selected to fill a full-time radiologic technologist position at Defendant's Penderbrook facility in Virginia. Plaintiff was scheduled to begin work at Penderbrook on January 10, 2005, but did not do so because her employment was terminated on January 7, 2005.  Plaintiff notified Ms. Boyette of her impending transfer to Penderbrook in writing on December 23, 2004.  (Paper 19, Ex. 12).  Plaintiff argues that because of racial animus, Ms. Boyette "orchestrated a confrontation to justify terminating Plaintiff before she could transfer . . . ."  (Paper 20, at 6).

Defendant contends that Plaintiff was discharged due to insubordination in a series of altercations with Ms. Boyette. Defendant's understanding of the facts of these confrontations is set forth in a memo advising Plaintiff of the reasons for her discharge:

> Effective Friday January 7th 2005 your employment with Kaiser Permanente will be terminated.  This is due to your gross

misconduct and flagrant insubordination that took place over a course of several days.

Specifically In [sic] November 2004 you were told that after I carefully reviewed the schedule and the departmental need, essential personnel only was needed for the Christmas and New Year holidays. . . . In December 2004 I reiterated this staffing plan and the fact that none of the Imaging Assistants would be scheduled to work the holidays. . . .

However you defiantly told me you would come in to work and you did report to work on December the 24th 2004. You were informed that you were working unauthorized overtime, and insubordinate, as a result you were asked to punch-out and leave which you refused to do. You caused confusion in the department involving other departments and external parties (P.G. police department) by your defiance which created a hostile environment. I told you; you were suspended placed on administrative leave with pay I also told you not to come to work until further notified by myself and or your union representative. You were aware Ms. Evelyn Ross [the union steward] witnessed the entire conversation via phone. You ignored my instruction to you and came to work the following day, you refused to leave thus you had to be escorted out of the facility by P.G. police officers because you would not leave when asked by security.

On Friday December the 31st you again came to work which was unauthorized, at which time the covering supervisor was not aware until Saturday January the 1st 2005, when you again showed up for work without authorization by me. The covering supervisor reiterated that you were not to return to work until notified by me, she also emphasized that she had spoken with me, yet you remained at work.

While I was at work on Sunday January the 2nd I discovered once again you were at work unauthorized and you refused to leave.

(Paper 16, Ex. 17 to Ex. A).   Plaintiff contests some of these facts.   She explains that she had submitted a leave request for Friday, December 24, 2004, and did not receive approval for this request.   She asserts that she was never told not to report to work on December 24 and December 25, 2004, and that she did not receive e-mails from Ms. Boyette instructing her not to work that have been submitted as part of this litigation.   Plaintiff also contends that although she was told on December 24 that she was suspended, she did not understand that this meant she was not to report to work again as previously scheduled.   Plaintiff claims that Ms. Boyette became threatening and hostile when she confronted Plaintiff on December 24, 2004, and that Plaintiff was afraid to leave work because she had to walk closer to Ms. Boyette to collect her personal belongings before leaving.[3]

Plaintiff filed a complaint asserting violations of Title VII, Maryland tort law, and the Prince George's County Code in the Circuit Court for Prince George's County, Maryland.   Defendant removed the action to this court on March 7, 2006.   Plaintiff's complaint includes five counts, claiming racially discriminatory termination under both Title VII and the Prince George's County Code, creation of a racially hostile workplace in violation of both

---

[3] Plaintiff has also filed a notice that Ms. Boyette's employment with Defendant had ended involuntarily sometime before November 24, 2006.   (Paper 22).   Plaintiff has forecast no admissible evidence of this fact, and it is not clear how it would be relevant to any of the issues material to Defendant's motion.

Title VII and the Prince George's County Code, and negligent retention under Maryland tort law.

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a

particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  Discriminatory Discharge (Counts III and IV)

Plaintiff claims that she was discharged because of her race. There are two methods for proving intentional discrimination in employment: (1) through direct or indirect evidence of intentional discrimination, or (2) through circumstantial evidence under the three-step, burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). For the first method, an employee may utilize "ordinary principles

of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue." *Rhoads v. Fed. Deposit Ins. Co.*, 257 F.3d 373, 391 (4th Cir. 2001) (internal quotation omitted), *cert. denied*, 535 U.S. 933 (2002).  In order to overcome a summary judgment motion based upon this method of proof, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact."  *Id.*  (internal quotation omitted).  More specifically, the plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  *Id.* at 391-92 (internal quotation omitted). If such evidence is lacking, the plaintiff nevertheless may proceed under *McDonnell Douglas*.  *See Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

Under the *McDonnell Douglas* framework, the plaintiff first must establish a *prima facie* case of discrimination.  *See McDonnell Douglas Corp.*, 411 U.S. at 802.  Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to present a legitimate, nondiscriminatory reason for the adverse employment action alleged.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (citing *Tx. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  If the defendant succeeds in doing so, that will rebut the presumption of

discrimination raised by the plaintiff's *prima facie* case.  *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10).  The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.  In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

In addition to Title VII, Plaintiff alleges discriminatory discharge and hostile work environment in violation of the Prince George's County Code.  Section 2-222 of the Prince George's County Code provides: "No employer in the County shall discharge or refuse to hire any person, or act against any person with respect to compensation or other terms and conditions of employment, or limit, segregate, classify, or assign employees because of discrimination."  The prohibition on racially motivated discharge and harassment in this section is substantially similar to the prohibition under Title VII, and both parties apply the *McDonnell Douglas* framework to all four of Plaintiff's discrimination claims. Neither party argues that the standard of proof differs in any respect between Plaintiff's county and federal claims. Accordingly, Plaintiff's two discriminatory discharge claims will

be analyzed simultaneously, as will her two hostile work
environment claims.

Plaintiff has not forecast any direct evidence of
discrimination connected to the termination of her employment. *See
Rhoads*, 257 F.3d at 391-92. Therefore, she must proceed under the
*McDonnell Douglas* framework. Under that framework, Plaintiff bears
the initial burden of establishing a *prima facie* case of
discriminatory discharge. As the United States Court of Appeals
for the Fourth Circuit has explained,

> [t]o establish a prima facie case of racial
> discrimination in the enforcement of employee
> disciplinary measures under Title VII, [a
> plaintiff] must show that: (1) [s]he is a
> member of a protected class; (2) [s]he was
> qualified for h[er] job and h[er] job
> performance was satisfactory; (3) [s]he was
> fired; and (4) other employees who are not
> members of the protected class were retained
> under apparently similar circumstances.

*Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 133 (4th Cir. 2002)
(footnote omitted) (citing *Hughes v. Bedsole*, 48 F.3d 1376, 1384
(4th Cir. 1995); *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th
Cir. 1993)). As to the fourth element, summary judgment based on
a failure to establish a *prima facie* case of discharge in violation
of Title VII is appropriate where a plaintiff, after discovery, is
"unable to identify a single person that was treated differently"
under similar circumstances. *Byrd v. Balt. Sun Co.*, 279 F.Supp.2d
662, 669 (D.Md. 2003), *aff'd*, 110 Fed.App'x 365 (4th Cir. 2004).

Defendant acknowledges that Plaintiff is a member of a protected class and that she was fired from her position, but argues that Plaintiff cannot show that her job performance was satisfactory or that other employees outside her protected class were retained under similar circumstances. It contends that Plaintiff's employment was terminated for insubordination because she repeatedly reported to work after being instructed not to report to work and after being suspended and because she refused to comply immediately with instructions to leave work. (Paper 16, Ex. 17 to Ex. A). Plaintiff has not submitted evidence sufficient to support a conclusion that Defendant imposed less severe discipline on any employee outside of her protected class who was accused of similar misconduct.

Plaintiff's allegation in her affidavit that Ms. Boyette generally refused to impose discipline against Plaintiff's African American co-workers who, for example, watched movies at work, took extended breaks, and arrived at work late or left early (paper 19, Ex. 3, McIlwain Aff., at 1 ¶¶ 3-4) is insufficiently specific to support Plaintiff's *prima facie* case. Plaintiff's affidavit does not identify any specific employee who engaged in any of the actions she described. In addition, this conduct is far different from the repeated insubordination of which Plaintiff was accused.

Plaintiff also alleges that she reported to Ms. Boyette that Ms. Williams had watched part of the movie "White Chicks" while at

12

work, and that another co-worker, radiologic technologist Phil Dedmon, who is African American, had repeatedly left the department. (Paper 16, Ex. A, McIlwain Dep., at 310-11, 329-35). Plaintiff contends that it appeared that no discipline was imposed in either of these cases. These allegations are specific, but they are insufficiently similar to the allegations that were the basis for Plaintiff's discharge. Ms. Boyette's memo indicates that Plaintiff was terminated because of repeated insubordination because she showed up for work when Ms. Boyette believed she had asked her several times not to do so, refused to leave work when instructed to do so, continued to show up for work after being suspended, and again failed to leave work promptly when instructed to do so. (Paper 16, Ex. 17 to Ex. A). Plaintiff does not allege that Ms. Williams, Mr. Dedmon, or any other employee of Defendant was accused of having ignored similarly direct and specific directions in front of a supervisor. Plaintiff's statement provides no support for a conclusion that any employee outside her protected class was accused of similar misconduct, because she does not allege that any other employee engaged in similarly direct insubordination. Accordingly, Plaintiff has not established a *prima facie* case of discriminatory discharge, and summary judgment will be granted in Defendant's favor with respect to counts III and IV of Plaintiff's complaint.

**IV.   Hostile Workplace and Harassment Claims (Counts I and II)**

Plaintiff also alleges that Defendant violated Title VII and the Prince George's County Code because Ms. Boyette tolerated or fostered a hostile work environment based on Plaintiff's race.[4]  In order to make out a *prima facie* case of a racially hostile work environment, Plaintiff

> is obliged to "demonstrate that a reasonable jury could find [any] harassment (1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).  In addition, she must show that there is some basis for imposing liability on [Defendant]. *See id.* at 184.  . . .  To establish that harassment was based on race, [Plaintiff] "must show that 'but for' [her] race . . ., [she] would not have been the victim of the alleged discrimination." *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000) (concluding that personal disputes with supervisor, without evidence that harassment was racial in nature, were not enough to sustain summary judgment on hostile work environment claim).

*Gilliam v. South Carolina Dept. Of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007).  Plaintiff may demonstrate that incidents of harassment upon which she bases this claim were racially motivated either by providing "direct evidence that [the harassing] . . .

---

[4] As discussed above, Plaintiff asserts no basis for analyzing her claims under the Prince George's County Code under a different standard than her Title VII claims.  Accordingly, these claims will be analyzed simultaneously.

conduct was motivated by racial animosity" or by providing evidence that she was treated differently than similarly situated employees outside her protected classification.   *Id.*

Plaintiff generally states that Ms. Boyette allowed African American employees to violate company policy, and, when Plaintiff reported this activity, Ms. Boyette took the side of and comforted the other employees.   (Paper 19, Ex. 3, McIlwain Aff., at 1). Plaintiff has not provided any evidence of instances when she was disciplined for conduct she alleges Ms. Boyette allowed African Americans to engage in, such as arriving at work late, leaving early, or watching movies at work.   Thus, there is no evidence that Plaintiff would not have been allowed to engage in similar conduct. Moreover, Plaintiff relies exclusively on her own general allegations of discriminatory treatment.   An employee cannot withstand summary judgment on a hostile workplace claim by providing only her own general statements of dissimilar treatment without providing specific factual instances or corroborating evidence.   *See Gilliam*, 474 F.3d at 143 ("general statements of dissimilar treatment . . ., standing alone, are insufficient to sustain an actionable Title VII claim" based on a racially hostile workplace) (citing *Causey*, 162 F.3d at 801-02).   Accordingly, Plaintiff's general allegations of differential treatment are not adequate to withstand summary judgment.

Plaintiff offers more details about several instances of alleged harassment, but she forecasts insufficient evidence that these incidents would not have occurred but for her race. Plaintiff testified during her deposition that she "could not get [her] leave slips returned" by Ms. Boyette. (Paper 16, Ex. A, McIlwain Dep., at 326). Plaintiff stated that she understood it to be Defendant's policy that leave slips should be returned to employees after a maximum of two weeks. (*Id.*). Plaintiff also testified that Ms. Boyette did not quickly return leave slips, and sometimes requested that leave slips be submitted up to three months in advance. (*Id.*). Plaintiff has provided no evidence that leave slips were returned more quickly to employees outside her protected classification, and she forecasts no direct evidence linking Ms. Boyette's delay in processing leave requests to her race.

Plaintiff also contends that she was not allowed to participate in imaging week activities in 2004 on account of her race. Plaintiff testified that imaging week, which takes place around November each year, involves activities to honor the imaging department, such as games that offer the chance to win gift certificates or similar prizes. (Paper 16, Ex. A, McIlwain Dep., at 358). Plaintiff testified that in 2004 she

> wasn't there Monday though Friday to engage in those activities, but the supervisor previously would go out of their way to come by at some point in the weekend to touch base.

16

> They congratulate you.  They usually give you
> a gift certificate for lunch or dinner or
> bring some food to eat, a celebratory cake.
> You get a couple little gifts, at the least.

(*Id.* at 359).  Plaintiff acknowledges that she received her imaging week gifts, a bag and a mug, after writing a letter complaining about her exclusion from imaging week.  (*Id.* at 361).  Plaintiff has provided no evidence that employees outside her protected class who work only on weekends were treated any differently than Plaintiff was treated with respect to Defendant's imaging week activities in 2004.  She admitted during her deposition that she did not know whether other weekend employees were treated differently.  (*Id.* at 362).

Plaintiff also testified at her deposition that Ms. Boyette reprimanded her for taking a class to renew her CPR certification without prior permission and asserted that as an x-ray clerk, Plaintiff did not need certification.  (Paper 16, Ex. A, McIlwain Dep., at 316-19).  Plaintiff stated in her affidavit that "other African American employees were permitted to take CPR classes" when she was not.  (Paper 19, Ex. 3, McIlwain Aff., at 1).  Plaintiff has not forecast any evidence, even in her own affidavit, that includes any details about specific employees outside her protected class who were allowed to take CPR classes.  Plaintiff's statement in her deposition is insufficient, in the absence of additional details, to support an inference that African American employees

with similar positions supervised by Ms. Boyette were allowed to take CPR classes without prior approval.

Although it is not entirely clear, it appears that Plaintiff may also claim that Ms. Boyette's refusal to allow Plaintiff to fill in for absent radiologic technologists constitutes a racially hostile aspect of her workplace.[5]  Plaintiff argues that she has established adequate indirect evidence that Ms. Boyette's decision to hire temporary staff to fill in for radiologic technologists was racially motivated because most of the temporary staff who filled in as radiologic technicians were African American.  Plaintiff testified during her deposition, however, that at least one of the temporary employees was Caucasian.  (Paper 16, Ex. A, McIlwain Dep., at 87).[6]  To demonstrate through indirect evidence that Ms. Boyette's refusal to allow Plaintiff to fill in temporarily for a higher-level position was based on race, Plaintiff would have to identify specific employees outside Plaintiff's protected classification who were allowed to fill in for higher-level

_____

[5] Plaintiff argues that Ms. Boyette's decision is a reason to conclude that Defendant's asserted rationale for terminating Plaintiff's employment was pretext, but does not appear to assert that this decision was a discrete act of discrimination giving rise to an independent claim under Title VII.  (Paper 20, at 5, 8-9).

[6] Plaintiff contends that a list of individuals submitted by Defendant during discovery is a list of temporary staff, and observes that most of these individuals are African American.  (Paper 20, at 5).  Defendant explains, however, that this list was produced as part of its response to Plaintiff's interrogatory number 12, and lists the permanent employees who reported directly to Ms. Boyette.  (Paper 21, at 9; *id.* Ex. 1, at 2-3).

positions under similar circumstances. *See Gilliam*, 474 F.3d at 142-43. Plaintiff has failed to forecast such evidence. She asserts that such arrangements "happen[] all the time due to many reasons, to this very day." (Paper 16, Ex. A, McIlwain Dep., at 299). This general allegation is insufficient to withstand summary judgment because it does not assert that individuals outside Plaintiff's protected class were allowed to make these arrangements and because it includes no specific details. *See Gilliam*, 474 F.3d at 143.

Plaintiff also describes several instances of alleged harassment that do contain some racial component. Even assuming that each of these incidents is adequately linked to Plaintiff's race and is true, however, these allegations are insufficient to establish the severe and pervasive pattern of harassment necessary to prove a claim of hostile workplace discrimination under Title VII.

> In assessing whether a work environment is objectively hostile, a court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . No single factor is determinative.

*Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002) (citations omitted) (quoting and citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Plaintiff described one instance when she alleges that Ms. Boyette consoled rather than disciplined an African American employee, Mr. Dedmon, who Plaintiff had accused of repeatedly leaving his post.  On this occasion, Plaintiff was asked to meet with Ms. Boyette and Mr. Dedmon to discuss Mr. Dedmon's request that Plaintiff stop bringing his patients directly back to him when they checked into the department.  Plaintiff then complained that Mr. Dedmon frequently left the department, and that she was unhappy and sometimes uncomfortable going to look for him when his patients arrived.  Mr. Dedmon "became very upset that [Plaintiff] had said that.  So much so that he promptly walked out of the meeting.  Ms. Boyette followed him . . . and they went off into a back room." (Paper 16, Ex. A., McIlwain Dep., at 310).  Plaintiff contends that when she later went to ask Ms. Boyette a question, "she had her arm on his back, saying, oh baby, I don't want you to be upset.  I didn't come here to upset you.  Are you all right?" (*Id.* at 311).

Plaintiff argues that she was harassed regarding allegations that her son made a racially derogatory remark to another employee of Defendant, Robin Taylor.  Ms. Taylor submitted a "Quality and Risk Report" form to Defendant on September 30, 2004 alleging that Plaintiff's son called the imaging department looking for Plaintiff, spoke with Ms. Taylor, and made a racially derogatory remark to her.  (Paper 19, Ex. 10).  Plaintiff testified at her deposition that Ms. Boyette called her into a meeting on her next

20

scheduled work day to discuss these allegations.  (Paper 16, Ex. A, McIlwain Dep., at 341).  Plaintiff also testified that she did not consider it harassment for Ms. Boyette to investigate Ms. Taylor's allegations, (*id.* at 347-48, 352) but felt that Ms. Boyette should have called her soon after the incident rather than surprising her with a meeting regarding the allegations.  (*Id.* at 347).  Although this incident bears some relation to race, Plaintiff has not demonstrated that she was treated any differently by Ms. Boyette than any employees outside her protected class under similar circumstances, nor has she forecast any direct evidence that Ms. Boyette would have handled the situation differently but for Plaintiff's race.

Plaintiff also contends that Ms. Boyette failed to discipline Ms. Williams for watching part of the movie "White Chicks" on a portable DVD player while at work in December 2004.  Plaintiff explained during her deposition that although she only glanced at the screen once, she was able to overhear the movie (paper 16, Ex. A, McIlwain Dep., at 331) and believed it to be racially insensitive and offensive.  Plaintiff also indicated that it would be a violation of Defendant's policies for an employee to watch movies at work or even have a DVD player at work.  (*Id.* at 334).  Plaintiff testified that Ms. Williams watched the movie for at most an hour, and then went to lunch.  (*Id.* at 332).  Plaintiff called Ms. Boyette's pager to report the incident, and by the time Ms.

Boyette called back, Ms. Williams had left.  Plaintiff testified that she told Ms. Boyette that Ms. Williams was watching a DVD at work, and that she thought the film was "White Chicks," but it is not clear from her testimony that Plaintiff advised Ms. Boyette that she found the film racially offensive.  (*Id.* at 334-35). Plaintiff testified that Ms. Boyette seemed to be dismissive of her allegation; she asked whether Ms. Williams was still at work, and after being told she was not, did not discuss Plaintiff's complaint further.  (*Id.*).  Plaintiff stated that she does not know whether Ms. Boyette took any further action about the incident, but that she received no further communication relating to it.  (*Id.*).

Assuming that Plaintiff has forecast adequate evidence that each of these incidents was related to her race, these incidents, taken together, are not sufficiently severe and pervasive to sustain a hostile work environment claim.  The alleged harassment included being surprised by the meeting regarding the claims that her son used racially derogatory language, seeing a co-worker consoled by Ms. Boyette after Plaintiff asserted that he frequently left his post, and being unaware whether her complaints about the movie produced any disciplinary action.  Although Plaintiff contends that this conduct was subjectively offensive, this conduct, taking Plaintiff's descriptions as true, was not objectively severe enough to sustain her claim, and it does not satisfy any of the four factors under which objective severity and

pervasiveness are analyzed. *See Anderson*, 281 F.3d at 459 (quoting

*Harris*, 510 U.S. at 23). The alleged conduct is infrequent.

Plaintiff has alleged only three race-related incidents over

approximately five months that Ms. Boyette was her supervisor. In

addition, Plaintiff has not alleged any basis for a conclusion that

any of these incidents negatively affected her ability to perform

her job. Finally, the three alleged acts of harassment are not

particularly severe, and did not involve physical threats or

humiliation. Although Plaintiff may have been embarrassed when she

was confronted with the allegations about her son and when her

allegations regarding other employee's conduct were not taken as

seriously as she would have liked, this conduct is not objectively

severe or humiliating.

Finally, Plaintiff argues that she was subjected to a racially

hostile workplace because she was not notified of or selected for

the radiologic technologist position that was filled by Ms. Curry

and because she was not allowed to fill in for absent radiologic

technologists. It appears that Plaintiff's argument with respect

to the full time radiologic technologist position is that she was

harassed because she was not notified of this vacancy.[7] Plaintiff

---

[7] It is not entirely clear whether Plaintiff contends that she was denied this position as a discrete act of discrimination. Plaintiff has no direct evidence that she was not offered this job because of her race. In order to make out a circumstantial *prima facie* case for failure to hire, Plaintiff would have to prove, among other things, that she applied for the position, *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 319 n.6 (quoting
(continued...)

testified during her deposition that she did not see any posting
relating to this vacancy (paper 16, Ex. A, McIlwain Dep., at 357),
but also acknowledged that she might not have seen any posting
because she only works on weekends.  (*Id.* at 305).  The notice
relating to the vacancy indicates that applications for the positon
were accepted between Thursday August 5, 2004 and Thursday August
12, 2004.  (Paper 19, Ex. 9, at 1).  Plaintiff alleges that she was
not informed of the position because of her race, but she offers no
direct evidence that anyone deliberately withheld information from
her based on her race, or that employees outside of her protected
classification were provided with more notice of the vacancy.

## V. Negligent Retention Claim (Count V)

Plaintiff also claims negligent retention under Maryland tort
law, alleging that Defendant was negligent in retaining Ms. Boyette
as an employee because it should have known that she would harass
Plaintiff and create a racially hostile workplace.  Plaintiff
alleged in her complaint that Ms. Boyette's racial harassment was
the basis for this claim (paper 2, at 11-12), although she now also
asserts that Ms. Boyette assaulted her during their December 24,
2004 confrontation, putting her in reasonable fear of physical
harm.  (Paper 20, at 9).  Defendant contends that it is entitled to

---

[7](...continued)
*Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th
Cir. 2005)), which she admits she did not do.  (Paper 16, Ex. A,
McIlwain Dep., at 357).  Accordingly, Plaintiff cannot show that
she was denied this position because of her race.

summary judgment on this claim because it did not owe Plaintiff any duty relating to its alleged negligence, and because Plaintiff has introduced no evidence to support her argument that Defendant should have known Ms. Boyette would harass or assault her.

In order to establish a claim of negligent retention, Plaintiff must show that: "the employer of the individual who committed the allegedly tortious act owed a duty to the plaintiff, that the employer breached that duty, that there was a causal relationship between the harm suffered and the breach of the employer's duty, and that the plaintiff suffered damages." *Penhollow v. Bd. of Comm'rs for Cecil County*, 116 Md.App. 265, 295 (1997) (citing *Cramer v. Housing Opportunities Comm'n of Montgomery County*, 304 Md. 705, 712 (1985)).

"This Court has repeatedly held, however, that 'Title VII may not form the predicate for claims of negligent retention and supervision.'" *Hart v. Harbor Court Assocs.*, 46 F.Supp.2d 441, 444 (D.Md. 1999) (quoting *Demby v. Preston Trucking Co.*, 961 F.Supp. 873, 881 (D.Md. 1997). The *Demby* court reasoned that such a negligence claim is preempted by the exclusivity provisions of the Maryland Worker's Compensation Act. *Demby*, 961 F.Supp. at 881. The court explained that it was well established that "with the exception of injuries caused by an employer's deliberate intent to injure or kill [a] covered employee the Worker's Compensation Act provides the exclusive remedy to an employee for an injury or death

arising out of and in the course of employment." *Id.* (internal quotations omitted) (quoting *Lagrimas v. Gossel*, No. HAR 92-2262, 1993 WL 18951, at *3 (D.Md. Jan. 25, 1993); Md. Code Ann., Labor & Employ. § 9-509).  The court went on to explain that the fact that a negligence claim predicated on Title VII is "for dignitary injuries does not change the analysis." *Id.*  The *Demby* court also explained a second rationale:  "[a] cause of action for negligent retention existed at common law . . . and, accordingly, may only be predicated on common law causes of action . . . .  As such, Title VII may not form the predicate for claims of negligent retention and supervision." *Id.* at 881-82 (citations omitted) (citing *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F.Supp. 720, 751 (D.Md. 1996); *Hays v. Patton-Tully Transp. Co.*, 844 F.Supp. 1221, 1223 (W.D.Tenn. 1993)).

To the extent that Plaintiff bases her negligent retention claim on racially motivated harassment, her claim is barred under both of these theories.  Plaintiff points to no legal authority, aside from Title VII, to establish that Defendant owes Plaintiff any duty to prevent the existence of a racially hostile workplace, and no such duty existed at common law.  In addition, she forecasts no evidence that Defendant intentionally created such a workplace, so her claim is precluded by the exclusivity provisions of the Maryland Worker's Compensation Act.  *See Demby*, 961 F.Supp. at 881.  Plaintiff argues that if her Title VII claims do not survive

summary judgment, then her negligence claims should not be dismissed on the theory that it is predicated on Title VII.  Aside from Title VII, however, Plaintiff fails to identify any source of a duty owed to her by Defendant, and in defending her negligence claim, Plaintiff cites to no authority establishing such a duty.

Although Plaintiff's complaint asserts negligent retention based only on allegations of harassment and a hostile work environment, in opposing Defendant's motion for summary judgment, Plaintiff also argues that during her confrontation with Ms. Boyette on December 24, 2004, Ms. Boyette's actions "put Plaintiff in reasonable fear of assault from [Ms.] Boyette." (Paper 20, at 9).  Plaintiff testified during her deposition that Ms. Boyette became very angry, was pacing around, and that Plaintiff was afraid to walk past her to collect her personal belongings.  (Paper 16, Ex. A, McIlwain Dep., at 139, 141).  Even if this statement could support a claim for assault, which is an intentional tort, Plaintiff has asserted no evidence that *Defendant* intended any injury to Plaintiff, as would be required to evade the exclusivity provisions of the Maryland Worker's Compensation Act.  *See Demby*, 961 F.Supp. at 881; Md. Code Ann., Labor & Employ. § 9-509.  *But see Bryant*, 923 F.Supp. at 751-52 (granting summary judgment on the merits of an employee's battery-based claim of negligent supervision and retention without considering preclusive effect of Maryland Worker's Compensation Act).

Even if Defendant were subject to a duty with respect to any aspect of Plaintiff's negligent retention claim, summary judgment in favor of Defendant would be appropriate because Plaintiff has produced no evidence that Defendant was or should have been aware that Ms. Boyette might either harass or assault Plaintiff. Plaintiff alleged in her complaint that Ms. Boyette was disciplined short of termination for her actions during the December 24 confrontation, (paper 2, at 11), but she has introduced no evidence in support of this contention.  Plaintiff does not cite to any evidence in defense of her negligent retention claim, and has forecast no evidence that she or anyone else suggested to Ms. Boyette's supervisors that Ms. Boyette had engaged in racially motivated harassment or appeared likely to cause physical harm to Plaintiff.  Accordingly, summary judgment as to this claim will be granted in Defendant's favor.  *See Bryant*, 923 F.Supp. at 752 (granting defendant summary judgment as to battery-based negligent supervision and retention claim because the plaintiff produced no evidence that the defendant was aware of any allegations or risk of battery regarding plaintiff's supervisor).

## VII.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted with respect to each of Plaintiff's claims.  A separate Order will follow.


```
_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
```